# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CJS INVESTORS, LLC and CARY J. SIEGEL,**

    **Plaintiffs,**

v.                                                                                                     Case No: 6:18-cv-374-Orl-31DCI

**MATT BERKE and SSLS-FACTORING, LLC,**

    **Defendants.**

## ORDER

This matter comes before the Court without a hearing on the Motion to Dismiss (Doc. 19) filed by the Defendants, Matt Berke (henceforth, "Berke") and SSLS-Factoring, LLC ("SSLS"), and the response in opposition (Doc. 24) filed by the Plaintiffs, CJS Investors, LLC ("CJS") and Cary J. Siegel ("Siegel").

### I. Background

The instant case involves a falling-out among the owners of a Florida limited liability company: HBC Strategies, LLC ("HBC"). According to the allegations of the Complaint (Doc. 2), which are accepted in pertinent part as true for purposes of resolving the instant motion, Siegel is the sole owner of CJS. (Complaint at 2). In October 2014, CJS established HBC by filing articles of organization with the Florida Department of State. (Complaint at 2). Siegel has been president of HBC, a facilities maintenance company, since its inception. (Complaint at 2, 5). On the same day it filed the articles of organization, CJS executed an operating agreement (henceforth, the "Operating Agreement"), which, among other things, sets forth that HBC is to be managed by a board of managers. (Complaint at 6). At the outset, CJS was the sole member of

HBC, owning all 1,000 of HBC's membership units, as well as being its sole manager. (Complaint at 6). In the succeeding months, Walter Crossley invested in HBC and received 100 membership units. (Complaint at 8).

In late 2014 and the first half of 2015, a Georgia limited liability company, Red Wizard Group, LLC ("Red Wizard"), made a number of loans totaling several hundred thousand dollars to HBC pursuant to a promissory note (the "Note"). (Complaint at 8-9). On August 6, 2015, HBC entered into a loan modification agreement (henceforth, the "LMA") with Defendant SSLS, to which Red Wizard had transferred all of its interest in the Note.[1] (Complaint at 9). The LMA altered several terms of the Note, such as the interest rate to be paid by HBC and the deadline for paying off the loan, and authorized HBC to borrow up to another $575,000. (Complaint at 9). The LMA also provided that HBC "shall grant" 460 membership units to SSLS and 50 to Defendant Berke. (Doc. 2-3 at 10). Thus, as of the date of the LMA, SSLS owned 46 percent of HBC, Crossley owned 10 percent, and Berke 5 percent. (Complaint at 10). The Complaint also lists Siegel as owning the remaining 39 percent of HBC as of that date, via CJS. (Complaint at 10). As part of this arrangement, Berke was named CFO of HBC. (Complaint at 10-11).

The LMA included two provisions under which portions of SSLS's 460 membership units could be shifted to Siegel. First, the LMA provided that if HBC paid off the loan on time and with no "events of default," SSLS would transfer 20 of its membership units to Siegel. (Complaint at 11). The second potential equity shift involved National Landscape Management, another company controlled by Van de Grift (who controlled Red Wizard and SSLS). (Complaint at 12). SSLS agreed that if HBC or Siegel helped land a maintenance contract for National

---

[1] Red Wizard and SSLS are controlled by the same individual, Garrett Van de Grift. SSLS is also a Georgia company.

- 2 -

Landscape Management with one of HBC's customers, SSLS would transfer 50 of its membership units to Siegel. (Complaint at 12). As with the 20-unit shift, this 50-unit shift was made contingent upon HBC paying off the loan on time and without any events of default. (Complaint at 11-12).

The parties agree that HBC paid off the loan in August 2017, before it was due. They also agree that prior to that payoff, HBC and Siegel helped National Landscape Management obtain a maintenance contract with one of HBC's customers. However, they disagree as to whether any events of default occurred before the loan was paid. As a result, they also disagree as to whether Siegel is entitled to the 2 percent and 5 percent equity shifts from SSLS.

In addition, the parties agreed to have HBC buy out Crossley's 10 percent interest in October 2017, but they disagree as to what happened (or should have happened) to those 100 shares. The Plaintiffs allege that the parties agreed to distribute Crossley's 10 percent interest to each owner in proportion to the interest each already owned. (Complaint at 14). The Defendants argue that those 100 membership units are simply being held by HBC.

Thus, the Plaintiffs allege in the Complaint that, as a result of the equity shifts from SSLS to Siegel and the distribution of Crossley's interest, they now own the majority share of HBC:

> CJS/Siegel    51.1%
>
> SSLS         43.3%
>
> Berke        5.6%[2]

Toward the end of 2017, the parties' disagreement over their respective ownership shares came to a head. SSLS and Berke refused to sign an amended Operating Agreement that would

---

[2] For their part, the Defendants respond that the current ownership of HBC is the same as it was when the LMA was executed, except that HBC now holds what had been Crossley's units – *i.e.*, SSLS 46 percent, Siegel/CJS 39 percent, HBC 10 percent, and Berke 5 percent.

have reflected that the Plaintiffs, between them, owned 51.1 percent of HBC. (Complaint at 14-15). In addition, Berke made year-end ownership distributions to himself and to SSLS that the Plaintiffs allege were unjustified. (Complaint at 15). Eventually, Siegel purported to terminate Berke and cut off his access to the company's books, while Berke and SSLS purported to vote themselves onto CBC's board of managers and fire Siegel.

On February 16, 2018, CJS and Siegel filed the instant suit in state court in Orange County, Florida. The suit was removed to this Court on March 12, 2018.

## II. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to give the defendant fair notice of what the claim is and the grounds upon which it rests, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir.1984). In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988). The Court must also limit its consideration to the pleadings and any exhibits attached thereto. Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the required elements, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1302 (11th Cir. 2007). Conclusory

allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. at 1949 (internal citations and quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

**III.     Analysis**

The instant complaint includes eight counts. The first three counts seek declaratory relief: In Count I, Siegel seeks a declaration that no events of default occurred under the LMA prior to the repayment of the loan and that the two equity shifts totaling 7 percent of HBC occurred. In Count II, both Plaintiffs seek a declaration that the Defendants' actions in voting themselves onto the board of managers and firing Siegel were legally ineffective under the Operating Agreement. And in Count III, the Plaintiffs seek a declaration that SSLS and Berke agreed to divide Crossley's former shares between themselves and Siegel in proportion to the shares each of the three already owned.

In Count IV, which the Defendants do not seek to dismiss, CJS alleges that the Defendants breached the Operating Agreement, and in Count V Siegel alleges that the Defendants breached the LMA. In Count VI, both Plaintiffs allege that Berke, as CFO of HBC, breached his fiduciary

duty to Siegel and CJS in their capacity as members of HBC by making unjustified ownership distributions to himself and to SSLS. Count VII is a conversion claim brought by Siegel against SSLS as to the 70 ownership units allegedly due to Siegel as a result of the equity shifts pursuant to the LMA. And in Count VIII, Siegel alleges that SSLS and Berke entered into a conspiracy to deprive him of those same 70 ownership units. Thus counts I, V, VII, and VIII are brought solely by Siegel; counts II, III, and VI are brought by both Plaintiffs; and Count IV is brought solely by CJS.

### A. Standing

The Defendants argue that all of Siegel's claims must be dismissed because he is not a party to the LMA or the Operating Agreement (and not a member of HBC) and therefore lacks standing to pursue claims based on either agreement.[3] The Plaintiffs contend Siegel possesses standing as a third-party beneficiary of the LMA. (Doc. 24 at 16-17).

The parties agree that the LMA is governed by Georgia law. Under Georgia law, as a general rule, one not in privity with another lacks standing to assert any claims arising from violations of a contract. *Dominic v. Eurocar Classics*, 714 S.E.2d 388, 391 (Ga. App. 2011). However, Georgia law also provides that "[t]he beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." OCGA § 9-2-20(b). But the mere fact that a party may benefit from a contract does not make it a third party beneficiary of that contract. *Alexander Underwriters, Inc. v. Ins. Agencies of Ga., Inc.*, 275 S.E.2d 138, 140 (Ga. App. 1980). For a third party to have standing to enforce a contract, "it

---

[3] The Defendants also argue that CJS lacks standing to pursue the claims asserted in counts V, VII, and VIII, on the grounds that those counts are based on the LMA, to which CJS is not a party. However, as stated *supra*, those counts were asserted solely by Siegel. This portion of the Defendants' motion will be denied as moot.

must clearly appear from the contract that it was intended for his or her benefit," *Howerton v. Harbin Clinic, LLC*, 333 S.E.2d 288, 294 (Ga. App. 2015), and it must appear that *both* parties to the contract intended that the third party be a beneficiary of the agreement, *Southeast Grading, Inc. v. City of Atlanta*, 324 S.E.2d 776, 779 (Ga. App. 1984). The terms of the agreement may establish or refute the standing of a third party. *See, e.g.*, *Walls, Inc. v. Atlantic Realty Co.*, 367 S.E.2d 278, 281 (Ga. App. 1988) (concluding that purported third-party beneficiary lacked standing where agreement at issue provided that "[t]his subcontract is solely for the benefit of the signatories hereto.").

As Siegel points out, though he is not a party to the LMA, that agreement provides for equity shifts that would certainly benefit him. (Doc. 24 at 16). However, Section 5.11 of the LMA provides that "the parties acknowledge and agree that the obligations of Lender and Borrower set forth herein are not intended to and should not be relied on by third parties." (Doc. 2-3 at 14-15). Siegel responds that the language of Section 4.10 of the LMA, which governs the equity shifts, should trump the language of Section 5.11, thereby establishing him as a third party beneficiary, because the language of the former is specific while the language of the latter is general. *See Avion Systems, Inc. v. Thompson*, 666 S.E.2d 464, 467 (Ga. App. 2008). But Siegel has it backwards. As to the point at issue – whether he was an intended third party beneficiary of the LMA or merely someone who might benefit from it – Section 5.11 is on point, while Section 4.10 simply describes the requirements for him to receive a benefit.

Siegel offers no other explanation for the language of Section 5.11 other than an intent to eliminate third party beneficiaries. He also does not offer another argument that he possesses standing to pursue the claims he asserts in counts I through III and V through VIII. Accordingly,

the motion will be granted as to Siegel's claims in those counts.[4]  As Counts I, V, VII and VIII are asserted solely by Siegel, they will be dismissed in their entirety.

### B.     Count II

In Count II, the Plaintiffs set forth how the Defendants, as members of HBC, purported to make themselves managers of HBC and then, in their capacity as managers, purported to fire Siegel.  (Complaint at 27-34).  The Plaintiffs contend that the Defendants' actions in doing so violated the Operating Agreement in several different ways – such as by exceeding their authority and by failing to provide proper notice of the meetings where those actions were taken – and were therefore legally ineffective.  The Defendants argue that Count II must be dismissed because the factual allegations that support it are directly contradicted by the language of the Operating Agreement, and their actions were therefore authorized under that agreement.

However, the Defendants acknowledge that their authority to take most of the actions involved in (purportedly) taking control of HBC and firing Siegel depended upon them holding a majority of the company's ownership units.  For example, they admit that their action in naming themselves as managers "assum[es] the Defendants still held at least 51% of Member interests". (Doc. 19 at 16).  But as discussed *supra*, because of the alleged equity shifts and the dispute as to the interest formerly held by Crossley, a disputed question of material fact exists as to whether the Defendants still held such a majority interest at the time they tried to take control of HBC.  Thus even assuming that the Defendants are correct in their interpretation of the Operating Agreement,

---

[4] For the sake of simplicity, the remainder of this opinion will continue to refer to Siegel as having asserted those claims, even though they are being dismissed as to him.  In addition, the opinion will not address several arguments raised by the Defendants that only apply to Siegel's claims.

the Plaintiffs could still prevail as to this count if they prevail on the membership percentage issue. The motion will therefore be denied as to CJS's claim under Count II.

### C. Count III

The Plaintiffs allege that, after Crossley sold his 100 membership units back to HBC, Van de Grift (on behalf of SSLS) suggested that the shares be distributed to each member in proportion to the shares each already held. (Complaint at 35). The Plaintiffs allege that both Berke and Siegel accepted Van de Grift's proposal (with Siegel accepting on behalf of both himself and CJS). (Complaint at 35). However, when papers were drafted reflecting this *pro rata* distribution, SSLS and Berke refused to sign them. (Complaint at 35). In Count III, the Plaintiffs seek a declaratory judgment that they are entitled to 51 of the units, that SSLS is entitled to 43, and that Berke is entitled to 6. (Complaint at 36).

The Defendants argue that the Plaintiffs have failed to properly assert a claim for a declaratory judgment in this count. Count III is asserted pursuant to Chapter 86, Florida Statutes, which authorizes state courts to render declaratory judgments. (Complaint at 34). When a case is removed from state court on the basis of diversity of citizenship – as this one was – the federal court applies state substantive law and federal procedural law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ( "[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."). Both the federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Chapter 86, Florida Statutes are procedural; they do not create or change any substantive rights. *See, e.g., Nirvana Condominium Ass'n, Inc. v. QBE Ins. Corp.*, 589 F.Supp.2d 1336, 1343 n. 1 (S.D. Fla. 2008) (stating that Chapter 86 is "a procedural mechanism within the Civil Practice and Procedures Chapters" and does not "confer

any substantive rights"). Accordingly, the Court is obligated to treat Count III as if it sought relief under the federal Declaratory Judgment Act rather than Chapter 86, Florida Statutes.

The Declaratory Judgment Act provides that, "[i]n any case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The standard for determining whether an "actual controversy" exists within the meaning of the Declaratory Judgment Act is the same as that under the "case or controversy" requirement of Article III of the Constitution. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937). The Supreme Court has defined a "controversy" in the Constitutional sense as

> one that is appropriate for judicial determination.... The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Hendrix v. Poonai*, 662 F.2d 719, 721 (11th Cir.1981) (citing *Haworth*, 300 U.S. at 240-41, 57 S.Ct. at 464).

The Court has no difficulty in determining that the allegations of the Complaint, taken as true, show that a genuine controversy currently exists between the parties to this suit as to their respective ownership interests in HBC and, more particularly, their entitlement to the membership units formerly held by Crossley. The Defendants argue that the Plaintiffs have not established the existence of such a controversy because the Complaint does not allege "what amount the Defendants believe is correct." (Doc. 26 at 23). The Complaint does, however, allege that the

Defendants disagree with the Plaintiffs' calculation as to that amount, and this is sufficient to show that a controversy exists.[5] The motion will be denied as to CJS's claim under Count III.

**D.    Count VI**

In this count, the Plaintiffs allege that Berke, as CFO, had a fiduciary duty toward them in their capacity as members of HBC, which he breached by, *inter alia*, making unauthorized distributions to himself and SSLS.  (Complaint at 41).   The Defendants' only argument for dismissing CJS's claim is that, as Count VI was asserted on behalf of both Siegel and CJS, the Plaintiffs were improperly seeking a double recovery.   (Doc. 26 at 22-23).   Without addressing the merits of such an argument, the Court notes that Siegel's claim has been dismissed for lack of standing and therefore no double recovery is being sought.   The motion will therefore be denied as to CJS's claim under Count VI.

---

[5] The Defendants also argue that Count III cannot properly be asserted against Berke as he was not a party to the LMA and therefore cannot be found to have breached it.   (Doc. 26 at 25). However, Count III involves an alleged breach of an agreement to split up Crossley's shares, not a breach of the LMA.

### IV. Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion to Dismiss (Doc. 19) is **GRANTED IN PART AND DENIED IN PART**. Counts I, V, VII and VIII are **DISMISSED** for lack of standing. Counts II, III, and VI are **DISMISSED AS TO PLAINTIFF SIEGEL, ONLY** for lack of standing. In all other respects, the motion is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 22, 2018.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE