# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CJS INVESTORS, LLC,**

  **Plaintiff,**

**v.**                 Case No: 6:18-cv-374-Orl-31DCI

**MATT BERKE and SSLS-FACTORING, LLC,**

  **Defendants.**

## ORDER

This matter comes before the Court without a hearing on the Motion for Summary Judgment as to Counts II and IV (Doc. 53) filed by the Defendants, the response in opposition (Doc. 57) filed by the Plaintiff, and the reply (Doc. 58) filed by the Defendants.

**I.**    **Background**

This case grows out of a fight for control of HBC Strategies, LLC (henceforth, "HBC"), a Florida company that provides maintenance services and repairs to other businesses. (Doc. 57 at 3). Except where noted, the following facts are undisputed:

The Plaintiff, CJS Investors, LLC ("CJSI"), formed HBC in October 2014 and executed an operating agreement (the "Operating Agreement"), which governs the rights and responsibilities of HBC's members and managers. CJSI is owned by Cary Siegel ("Siegel").[1] When HBC was formed, Siegel became its president and CJSI became the sole member of HBC, owning all 1,000

---

[1] Siegel was originally a plaintiff in this case but was found to lack standing in regard to the claims asserted. (Doc. 39 at 12).

of HBC's membership units. Some time thereafter, Walter Crossley invested in HBC and received 100 of those units.

In late 2014 and the first half of 2015, a Georgia limited liability company, Red Wizard Group, LLC ("Red Wizard"), made loans totaling several hundred thousand dollars to HBC pursuant to a promissory note (the "Note"). Subsequently, Red Wizard transferred its interest in the Note to Defendant SSLS-Factoring, Inc. ("SSLS"). Both Red Wizard and SSLS are controlled by Garrett Van de Grift ("Van de Grift").

On August 6, 2015, HBC entered into a loan modification agreement (henceforth, the "LMA") with SSLS. The LMA altered several terms of the Note, such as the interest rate to be paid and the deadline for paying it off. The LMA also provided that HBC "shall grant" 460 membership units to SSLS and 50 to Defendant Matt Berke ("Berke"), an ally of Van de Grift. Based on the allegations of the Complaint and the assertions made in the instant motion and CJSI's response, as well as the text of the LMA itself, the parties agree that as of the effective date of the LMA, SSLS owned 460 units (or 46 percent), Crossley owned 100 units (10 percent), and Berke 50 units (5 percent), with CJSI owning the remaining 390 units (39 percent).[2] As part of this new arrangement, Berke was also named chief financial officer of HBC.

The LMA included two provisions under which portions of SSLS's 460 membership units could be shifted to Siegel. Section 4.10(e) of the LMA provided that

> **In the event that [HBC] repays ... in full with no defaults hereunder or Events of Default under the [Note] occurring prior to such repayment**, then [SSLS]'s equity shall be reduced by two

---

[2] The Complaint lists this 39 percent as owned by "Siegel via CJSI." (Doc. 2 at 10). The LMA shows the 39 percent as being held by Siegel, not CJSI. (Doc. 2-3 at 11). Given that the record in this case does not disclose any transfer of membership units from CJSI to Siegel, and given that it does not affect the outcome here, the Court will treat these 390 membership units as owned by CJSI.

percent (2%), which reduction shall increase the equity ownership of Cary Siegel.

(Doc. 2-3 at 11-12) (emphasis added).

The second such possibility involved National Landscape Management, another company controlled by Van de Grift. In Section 4.10(f) of the LMA, SSLS agreed that if HBC or Siegel helped land a maintenance contract for National Landscape Management with one of HBC's customers, SSLS would transfer 50 of its membership units to Siegel – again with the caveat that, pursuant to Section 4.10(e), HBC had to first repay the Note on time with no defaults or Events of Default:

> If and upon [HBC]'s compliance with Section 4.10(e), [SSLS]'s equity shall be reduced for each Landscape ... Agreement ... if [HBC] or Cary Siegel facilitates such Landscape Management Agreement through an informational meeting (then) [SSLS's] shall be reduced as follows:
>
> (i) Five percent for the first landscape management agreement;

(Doc. 2-3 at 12).

The parties agree that HBC repaid SSLS in September 2017, before the Note was due. And they also agree that, prior to that payoff, HBC and Siegel helped National Landscape Management obtain a maintenance contract with one of HBC's customers. However, the parties disagree as to whether any Events of Default occurred before the loan was paid. As a result, they also disagree as to whether Siegel is entitled to the 20-unit and 50-unit equity shifts from SSLS.

In October 2017, at Crossley's request, HBC bought back Crossley's 10 percent interest in the company. CJSI contends that the parties also agreed to distribute the units formerly owned by Crossley to each remaining owner in proportion to the interest each already owned. The Defendants argue that no such agreement occurred, and therefore those 100 membership units are simply being held by HBC. As described in more detail below, if CJSI is correct that the 50-unit

and 20-unit equity shifts occurred, and that Crossley's 100 units were distributed to the remaining owners in proportion to the interest each already owned, then CJSI and Siegel control a majority of HBC.[3] The Defendants contend that the ownership of HBC remains the same as it was when the LMA was executed, except that HBC now holds what had been Crossley's units – *i.e.*, SSLS 460 units, Siegel/CJS 390 units, and Berke 50 units, with 100 units held by HBC – and therefore they still control a majority of the units.

Toward the end of 2017, the parties' disagreement over who controlled HBC came to a head. Siegel purported to terminate Berke and cut off his access to the company's books. Berke and SSLS called meetings, purported to vote themselves onto the Board, and then purported to fire Siegel as president and install Berke and Van de Grift as officers of HBC. CJSI contends that the Defendants' actions failed because, among other things, they did not control a majority of HBC's membership units when they took them and because the meetings at which they purportedly took the actions were not properly noticed.

On February 16, 2018, CJSI and Siegel filed this suit in state court in Orange County, Florida. It was removed to this Court on March 12, 2018. Subsequently, Siegel was found to lack standing to assert the claims at issue in this suit, leaving CJSI as the sole plaintiff. (Doc. 39).

By way of the instant motion, the Defendants seek summary judgment as to Count II and Count IV of the Complaint. In Count II, CJSI seeks a declaratory judgment as to, among other things, the ownership of the membership interests in HBC and whether the efforts of SSLS and Berke to take control of HBC were effective. In Count IV, CJSI asserts a claim for breach of the Operating Agreement against both Defendants.

---

[3] Specifically, CJS and Siegel would own 511 of HBC's 1000 membership units, with SSLS owning 433 and Berke owning 56.

**II.     Legal Standard**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  Fed.R.Civ.P. 56(c).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.  The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments.  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553.  Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.*  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

**III.    Analysis**

### A. Count II -- Declaratory Judgment

Count II of the Complaint is asserted pursuant to Florida's Declaratory Judgment Act, Fla. Stat. §§ 86.011-86.111. A district court sitting in diversity must apply federal procedural law and state substantive law. *See Gasperini v. Ctr. For Humanities, Inc*., 518 U.S. 415, 427 (1996). Numerous Florida district courts and, in an unpublished opinion[4], the Eleventh Circuit Court of Appeals have held that Florida's Declaratory Judgment Act is procedural and does not confer any substantive rights. The Court's research has not revealed any cases reaching a different conclusion. Accordingly, the Court will construe Count II as though CJSI sought relief under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, rather than Florida's.

In Count II, CJSI seeks a declaration that

> (a) the Meeting Notices were not proper under the Operating Agreement; (b) the annual meeting of Members and the Special Meeting of the Board of Managers on February 9, 2018, was not proper; (c) SSLS and Berke are not proper Managers of HBC Strategies; (d) SSLS' and Berke's appointment of Berke as the President and Treasurer of HBC Strategies was not proper; (e) SSLS' and Berke's appointment of Van de Grift as the Vice-President and Treasurer of HBC Strategies was not proper; (f) SSLS' and Berke's termination of Siegel as President was not proper; (g) SSLS' and Berke's removal and replacement of Siegel as the Tax Matters Partner was not proper; and (h) Siegel/CJSI, not SSLS and Berke, owns at least 50.1 % of the voting interests in HBC Strategies.

(Doc. 2 at 34).

CJSI's request extends far beyond the boundaries of a proper declaratory judgment. The federal Declaratory Judgment Act provides that, "[i]n any case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be

---

[4] *Coccaro v. Geico Gen. Ins. Co.,* 648 F. App'x 876, 880 (11th Cir. 2016)

sought." 28 U.S.C. § 2201(a). Most of what CJSI seeks is not a declaration of the parties' rights but the resolution of a series of factual disagreements that do not necessarily alter those rights. Accordingly, rather than the eight topics as to which CJSI seeks a declaration, the Court will address only two: whether Siegel and CJSI together own a majority of the membership units of HBC, and whether SSLS and Berke were properly made Managers of HBC, such that they had the power to fire Siegel and install Berke and Van de Grift as officers.

**Membership Units**

As noted *supra*, the parties agree that as of the effective date of the LMA, SSLS owned 46 percent of HBC's membership units, CJSI owned 39 percent, Crossley owned 10 percent, and Berke owned five percent. CJSI argues that it and Siegel now control more than 50.1 percent of those units by virtue of (1) equity shifts from SSLS of two percent for paying off the debt early and five percent for helping Van de Grift's other business obtain a maintenance contract and (2) Crossley's ten percent being distributed to each remaining owner in proportion to the units that owner already held. However, the Court finds that, as a matter of law, the equity shifts did not occur.[5]

By the plain terms of Section 4.10 of the LMA, the equity shifts were contingent upon repayment of the Note with no "Events of Default." (Doc. 2-3 at 12). Section 2.10 of the LMA provides that "any breach or default by [HBC] with respect to any provision of [the LMA] shall constitute an Event of Default under [the Note]." (Doc. 2-3 at 6). Section 4.2 of the LMA

---

[5] This finding moots the need for this Court to determine whether the units previously owned by Crossley were distributed proportionally to each owner or continue to be held by HBC. Either way, in the absence of the equity shifts, SSLS and Berke continue to hold at least 510 of HBC's 1000 membership units.

required, *inter alia*, that HBC provide certain financial reports to SSLS.[6] CJSI admits that some of these reports were not provided to SSLS. (Doc. 2 at 24-25).

CJSI argues that the failure to provide these reports was "non-material" and therefore did not constitute an Event of Default. (Doc. 57 at 17). In the alternative, CJSI argues that the failure should be attributed to Berke, who was HBC's CFO during the relevant time frame, rather than HBC, on the grounds that it was his responsibility to provide the reports. (Doc. 57 at 17). But the LMA does not set any materiality threshold for Events of Default. According to Section 2.10, any breach of any of any LMA provisions is an Event of Default. (Doc. 2-3 at 6). And CJSI provides no support, legal or factual, for its argument that the failure to provide the reports was not material.

As for CJSI's second argument, the LMA imposed the reporting obligation on HBC, not Berke. CJSI does not point to any language in the LMA (or any evidence from outside it) that the obligation was ever shifted to Berke or that Berke somehow prevented Siegel – HBC's president at the time – from seeing that HBC fulfilled this contractual obligation.

Based on the undisputed facts and the unambiguous language of the LMA, HBC's failure to provide financial reports constituted at least one Event of Default, which occurred prior to the repayment of the Note. Therefore, the equity shifts from SSLS to Siegel did not occur. As a result, SSLS and Berke continue to hold at least 510 of HBC's membership units between them, and CJSI is not entitled to a declaratory judgment to the contrary.

**Board Membership**

---

[6] For example, Section 4.2(b) provided in pertinent part that, "[e]ach Friday, [HBC] shall deliver to [SSLS] a simple and straightforward report in Excel or similar format acceptable to [SSLS] that details the timing and amount of revenue received from customers and the corresponding payments due or made on a work order by work order basis." (Doc. 2-3 at 9).

Section 3.01 of the Operating Agreement provides that HBC will be managed by a Board of Managers (the "Board"), elected by the company's members, and that the Board "shall at all times consist of at least three (3) persons."[7]  (Doc. 2-1 at 10).   Initially, however, the Board had only one manager: CJSI.   (Doc. 2-1 at 11).

Section 4.04 of the Operating Agreement permits members to act by written consent rather than at a meeting.   (Doc. 2-3 at 16).   Relying on this authority, on January 31, 2018, SSLS and Berke purported to appoint themselves to the Board; subsequently, in their capacity as Managers, they purported to fire Siegel from HBC and appoint Berke and Van de Grift as officers.   CJSI seeks a declaration that SSLS and Berke failed in their efforts to vote themselves onto the Board, meaning that their efforts to fire Siegel and to hire Berke and Van de Grift were also ineffective.

CJSI raises several arguments as to why the efforts of SSLS and Berke failed in this regard.   First, CJSI argues that, due to the equity shifts, by January 2018 SSLS and Berke no longer controlled a majority of HBC's membership units and therefore could not have voted themselves onto the Board over the votes of CJSI and Siegel.   As discussed *supra*, this argument fails because the equity shifts never occurred, leaving SSLS and Berke with a majority of the membership units.

Section 4.02 of the Operating Agreement governs meetings of the members and provides that an annual meeting "for the election of the Board of Managers and the transaction of such business as may properly come before the meeting shall be held during January or February of each year at a time, date, and place that the Board of Managers shall determine."   (Doc. 2-1 at

---

[7] Pursuant to Section 3.05 of the Operating Agreement, each manager on the Board is entitled to one vote, and unless otherwise specified, approval of any measure before the Board requires a simple majority.

15).  In the event the Board fails to notify the members of the meeting time and location by January 20 of any year, Section 4.02 provides that "any Member may call the annual meeting for that year and specify the time, date and place thereof."  (Doc. 2-1 at 15).  Section 4.02 also permits the Board or any member, at any time, to call special meetings of the members.  (Doc. 2-1 at 15).  Finally, Section 4.02 requires that the Board cause HBC "to deliver or mail a written notice stating the date, time, place, and purpose(s) of any meeting" to each member entitled to vote at the meeting.  (Doc. 2-1 at 15).

It is undisputed that the Board failed to notify the members of the annual meeting of the members by January 20, 2018, as required by Section 4.02 of the Operating Agreement.  On February 1, 2018, SSLS and Berke called a meeting of the members[8] for February 9, 2018 and provided notice of it to HBC and Siegel.  That same day, in their capacity as (newly self-appointed) Managers of HBC, SSLS and Berke called a special meeting of the Board, also for February 9, 2018, again providing notice to HBC and Siegel.  In calling the meeting of the Board, the Defendants relied on Section 3.05(b) of the Operating Agreement, which provides that

> An annual meeting of the Board of Managers for the election of the officers and the transaction of such business as may properly come before the meeting **shall be held during January or February of each year** at a time, date, and place that the Managers shall determine; provided, however, that the annual meeting of the Board of Managers in any given year shall only take place after the annual meeting of the Members in that year had already taken place.  The Managers may set the date, time and place of regularly scheduled meetings of the Managers.  **Special meetings of the Board of Managers may be called at any time by any Manager.  The president or the vice president, as required by Section 3.08, shall cause the Company to deliver or mail written notice stating the date, time, place, and purpose of any meeting to each Manager entitled to vote at the meeting.**  Such notice shall be given so that it is received by each Manager entitled to it, no less than five (5),

---

[8] The Defendants do not specify whether the meeting was intended to be the annual meeting of the members or a special meeting, as authorized by Section 4.02.

> and no more than thirty (30), days before the meeting date.
> However, **notwithstanding the above, the Managers may
> unanimously consent in writing to a regular meeting convened
> in an informal manner,** as they may determine their discretion, and
> such meeting at which all the Managers are present shall be
> conclusively determined to have been convened in conformity with
> the Act[9] and this Agreement.

(Doc. 2-1 at 12) emphasis added). After objections from CJSI and Siegel, on February 8, 2018, the Defendants requested that CJSI call a special meeting of the members and Siegel call a special meeting of the Board, both for February 15, 2018. CJSI and Siegel declined to do so, so the Defendants called those meetings themselves and sent out their own notices regarding the February 15 meetings on February 9, 2018. (Doc. 53 at 13).

On February 9, 2018, the Defendants held what they termed the annual meeting of the members, followed by a special meeting of the Board. At those meetings, among other things, the Defendants approved their own appointment to the Board, removed Siegel from his positions with HBC, and appointed Berke and Van de Grift as officers of HBC.[10] On February 15, 2018, the Defendants held special meetings of both the members and the Board. At these latter meetings, the Defendants approved the actions taken at the February 8 meetings.

CJSI does not deny that it (and HBC and Siegel) actually received notice of the various meetings in February. Instead, CJSI argues that the Operating Agreement does not permit the Defendants to "unilaterally schedule the date, time, and location of any meeting or notice such a

---

[9] "Act" refers to the Florida Limited Liability Company Act, Fla. Stat. § 605.0501, *et. seq.* (Doc. 2-1 at 3).

[10] Generally, Section 3.08 of the Operating Agreement authorizes the Board to appoint a president, vice president and other company officers. (Doc. 2-1 at 13). Section 3.08(f) provides that the Board may remove any company officer at any time. (Doc. 2-1 at 14). Section 3.10 designates Siegel as HBC's "tax matters partner" and provides that the members could remove him from that position at any time. (Doc. 2-1 at 15).

meeting for that matter." (Doc. 57 at 19). But CJSI's argument here is contradicted by the language of the Operating Agreement, which allows annual and special meetings to be called with no restrictions as to their time or location.[11] Similarly, while Section 3.05(b) and Section 4.02 of the Operating Agreement require that HBC or its officers provide notice of such meetings, nothing in that agreement prohibits a member or a Manager from doing so.[12]

Finally, CJSI argues that SSLS's action were prohibited by Section 4.10(h) of the LMA, which provides that SSLS's equity interest in HBC

> shall not entitle [SSLS] to exert control over the management of [HBC]; provided that; [SSLS] shall have the right to vote with the other members on any major transactions.

(Doc. 2-3 at 12). This passage does not apply to the instant dispute. SSLS is not alleged to have relied on its equity interest to exert control over HBC's management; rather, SSLS voted itself onto the Board of Managers and then relied on its status as a Manager to replace HBC's management, something Section 4.10(h) does not prohibit.

Based on the foregoing, SSLS and Berke were properly appointed to the Board, and therefore they possessed the authority to fire Siegel and appoint Berke and Van de Grift as officers. CJSI is not entitled to a declaratory judgment to the contrary.

**B. Contracts**

---

[11] CJSI does not argue that the Defendants chose a time or location that made it impossible for others to attend, or anything of that nature, just that the Defendants had no authority, on their own, to pick the time or location for these meetings.

[12] CJSI also argues that Section 3.05(b)'s requirement that the president or vice-president of HBC provide notice of a meeting can only be waived "if all Managers consent to same." (Doc. 57 at 3-4). This is incorrect. Section 3.05(b) authorizes Managers to convene a regular meeting in an informal manner – for example, without any notice – if they unanimously consent in writing to doing so. (Doc. 2-1 at 12). But the unanimous consent requirement only applies to such informally convened meetings, not to the annual or special meetings that SSLS and Berke purported to convene.

In Count IV, CJSI contends that SSLS and Berke breached the Operating Agreement (a) by appointing themselves to the Board of Managers despite not holding more than 50 percent of HBC's membership units; (b) by holding the meetings on February 9, 2018 despite HBC's President having not provided notice of them; (c) by purporting to take actions in their capacity as Managers (such as firing HBC officers and appointing new ones) despite not having been properly appointed to be Managers and because SSLS is barred by Section 4.10(h) of the LMA from serving as a Manager of HBC. (Doc. 2 at 37-39). Each of these issues has been resolved in the Defendant's favor in connection with Count II. To recap: The equity shifts never occurred, and therefore SSLS and Berke held more than 50 percent of HBC's membership units at all relevant times; the Operating Agreement does not bar members or Managers from providing notice of annual or special meetings; and SSLS and Berke were properly appointed to the Board. Accordingly, the Defendants are entitled to summary judgment as to Count IV.

## IV. Conclusion

In their motion, the Defendants requested, *inter alia*, a declaration that "without regard to the redemption and reallocation of the Crossley shares, SSLS holds at least 46%, Berke holds at least 5%, and CJSI holds at least 39% of HBC" and that the "[w]ritten [c]onsent and meeting notices were proper." (Doc. 53 at 25). CJSI raised no objection to this form of relief. With slight edits, the Court finds the Defendants have demonstrated their entitlement to such a declaration.

Accordingly, in consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment as to Counts II and IV (Doc. 53) filed by the Defendants is **GRANTED**. And the Court hereby **DECLARES** that (1) without regard to the redemption and reallocation of the Crossley shares, SSLS holds at least 46% and Berke holds

at least 5% of the membership units of HBC and (2) the Defendants' actions taken by written consent, referred to above, and the meeting notices were proper.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on December 14, 2018.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE